FILED
2010 Jan-08  PM 06:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

LEXINGTON INSURANCE COMPANY,
as subrogee of Tyson Foods, Inc., et al.,

      Plaintiffs,

v.                           CASE NO. 1:08cv-01585-KOB

CONTRACTOR SERVICE &       ORAL ARGUMENT REQUESTED
FABRICATION, INC., et al.,

      Defendants.

## PLAINTIFFS' OPPOSITION TO DEFENDANT CONTRACTOR SERVICE AND FABRICATION, INC.'S MOTION FOR SUMMARY JUDGMENT

      COME NOW Plaintiffs, and in response to CS&F's Motion for Summary Judgment, ask that the same be DENIED, as there are multiple issues of material fact making judgment as a matter of law inappropriate.

## TABLE OF CONTENTS

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.    Disputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     B.    Alleged Undisputed Facts Which Require Denial of Summary
           Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.   Legal Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A.    Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

B.    Tyson Has Established Evidence that CS& F Breached Their Duty of
      Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      1.    CS&F Failed to Perform a Proper Fire Watch Because it
            Failed to Enter and Inspect the Interstitial Space Between
            the Roof and Drop-down Ceiling and Failed to Extend
            Their Fire Watch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.    Proximate Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      1.    Worsham's Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      2.    The Identity and Flammability of the Exposed Materials Which
            led to The Fire Is a Question of Fact . . . . . . . . . . . . . . . . . . . 24

      3.    The Evidence Points to One Theory of Causation, Thus
            Worsham's Testimony is Not Speculation Nor Conjecture . . 25

      4.    The Evidence Does not Require the Jury to Speculate on the
            Origin of the Fire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

D.    Contributory Negligence and Last Clear Chance . . . . . . . . . . . . . . . 30

      1.    Any Alleged Contributory Negligence of Tyson is Question of
            Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

            (a)    Disengaged Smoke Detector . . . . . . . . . . . . . . . . . . . 31

            (b)    Fire Suppression System . . . . . . . . . . . . . . . . . . . . . . 32

            (c)    Hot Work Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      2.    Last Clear Chance Doctrine/Subsequent Negligence Prevents
            Application of the Contributory Negligence Bar . . . . . . . . . . 34

E.    Whether CS&F Acted Wantonly Is an Issue of Fact for the Jury
      Because Plaintiffs Have Presented Sufficient Evidence to Infer
      Wanton Conduct on the Part of CS&F . . . . . . . . . . . . . . . . . . . . . . . 36

F.    Plaintiffs Have Established Sufficient Evidence that CS&F Breach
      Specific Terms of its Contract with Tyson . . . . . . . . . . . . . . . . . . . 38

G.    Plaintiffs Have Established Sufficient Evidence that CS&F Knew Or
      Should Have Known That Its Employees Were Not Properly Trained
      And/or Supervised  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

# I.  <u>INTRODUCTION</u>

At approximately 4:30 p.m. on September 23, 2006, a devastating fire originated at the southeast corner of the Tyson chicken processing facility in Heflin, Alabama, causing millions of dollars in damages.  (Am. Comp., Doc. 15).  The fire was reported near the end of a workday, after Defendant CS&F was performing "hot work" on the facility's roof at the southeast corner.  The work consisted of CS&F using cutting wheels and grinders which throw off fire sparks in the removal of a metal roof and roof supports in the area immediately above where the fire originated. Co-defendant Quality was also using an open flame torch in the same area. Specifically, witnesses have testified that CS&F was performing hot work with a grinder in the area of the Offal and Picking/Re-hang Rooms immediately before discovery of the fire.  (Rios Depo. 65-66, Ex. D10; Barger Depo. 133-136, Ex. D11;

Anderson Depo. 34, Ex. D12).   According to Quality's supervisor, sparks from CS&F's hot work were flying all over he and his crew.  (Rios Depo. 43, Ex. D10). Plaintiffs' theory is that either sparks thrown by CS&F's grinders; the open flame torch of co-defendant Quality; or a combination of both caused a spark and/or flame to contact combustibles and enter a temporary gap on the roof where CS&F was performing its hot work.  The heat source lit combustible materials in the area and created a fire in the void space between the roof and the drop ceiling between the Picking/Re-hang and Offal Rooms.  (Am. Comp., Doc. 15; J. Worsham Report, pp. 11-14, Ex. C).

CS&F recognized they had a legal and contractual duty to watch and investigate the areas in which they were working for potential fire by posting an employee dedicated to the task, commonly called a "fire watch."  (LaFavor Depo. 68, Ex. D16; Sutton Depo. 37, Ex. D3; Christofferson Depo. 53, Ex. D5; *see also*, NFPA 51B, §§ 4.41-4.47, Ex. X). However, CS&F failed to post a fire watch in the proper area and failed to extend their fire watch for the necessary period of time after work this work was completed.  (J. Worsham Report, p. 14, Ex. C).  Moreover, despite the fact that CS&F was throwing sparks in and around the area of an exposed gap, they failed to check the interstitial space beneath the gap for fire.  (Rios Depo. 43, 65-66, Ex. D10; J. Worsham Report, pp.84-85, Ex. C).  As a consequence of CS&F's breach

of its duty to post a proper fire watch and/or properly conduct their work on September 23, a fire originated at the southeast corner of the building where CS&F had been working.  (J. Worsham Report, pp. 12 &14, Ex. C).

CS&F argues that Plaintiffs do not have sufficient evidence of the fire's origin, nor the cause of the fire, nor a breach by CS&F which proximately caused the fire. Primarily, CS&F argues that because Plaintiffs' expert, John Worsham has not identified specifically which of the two defendants initiated the fire (although he has testified it could have been both), it is entitled to summary judgment in its favor.  This argument ignores not only the testimony establishing the defendants' combining and concurring fault in bringing about the fire, but also their breach of the duty to post an effective fire watch in the precise area where the fire originated.  But for these breaches, the subject fire would have been prevented or contained.

CS&F also argues that Plaintiffs have not established sufficient evidence of wantonness on the part of CS&F; that CS&F did not breach any contract with Tyson; and finally, that CS&F did not negligently train or supervise its employees.  As will be discussed below, because Plaintiffs have established evidence supporting each of these theories, summary judgment in CS&F's favor is improper.

## II.  <u>STATEMENT OF FACTS</u>

This section will address, below, the 133 "statements of undisputed relative

material facts" set forth by the Defendant.  Plaintiffs will first set forth – in separately numbered paragraphs that coincide with the Defendant's claimed undisputed facts – which "facts" are disputed.  The Plaintiffs will then set forth those "facts" – also in separately numbered paragraphs that coincide with the Defendant's claimed undisputed facts – which are allegedly undisputed but that require denial of summary judgment.[1]

A.    **Disputed Facts**

49.    Plaintiffs do not agree with this statement.  Several Quality employees have testified that they saw "sparks flying" towards the wall separating the Offal and Picking/Re-Hang rooms, and in fact that they were hit by those sparks.  (Rios Depo. 41:16-42:15, 47; 6-19, Ex. D10; Anderson Depo. 33:5-24, 34:15-17, 71:10-72:20, Ex. D12; Barger Depo. 65:18-66:14, Ex. D11.)

53.    Plaintiffs dispute this.  Record evidence exists that employees of CS&F were, in fact, using tools that created sparks well after their return from lunch.  (Rios Depo. 41:16-42:15, 47; 6-19, Ex. D10; Anderson Depo. 33:5-24, 34:15-17, 71:10-72:20, Ex. D12; Barger Depo. 65:18-66:14, Ex. D11.)

---

[1] In referring to evidence herein materials, the Plaintiffs have elected to use those materials included in CS&F's initial submissions, and will, therefore, use the corresponding exhibit letters.  To the extent that the Plaintiffs rely upon additional evidence not submitted by Defendant CS&F's  in its submission, the Plaintiffs will file those materials and will reference them herein beginning where CS&F's  exhibit numbers left off, *i.e.* Exhibit HH was CS&F's last exhibit, so Exhibit II will be where the Plaintiffs pick up exhibit numbers for the submission of new materials.

73-74.      Plaintiffs disagree that these paragraphs represents undisputed facts.  Seth Anderson testified that the flames "tried to singe Larry [Rios]" when the flap was pulled back, and that flames "licked out" about "1 foot or so."  Bobby Barger testified that "the fire started working to us," and "it was coming at me.  Yeah, it was coming."  Jesse Hager stated that he "found fire first <u>at the edge</u> of where bar joists were being removed," and further testified that he fought the fire in flames at the edge of the roof. (Sutton Depo. 57:20-58:15-59:18, Ex. D9; Anderson Depo. 67:18-68:23, Ex. D12; Barger Depo. 89:14-90:21, 93:4-7, Ex. D11; Hager Depo. 69:12-74:3, Ex. D21)

113.   CS&F mischaracterizes the testimony of Mike Carter here.  What Mr. Carter stated with respect to whether Mr. Brown helped investigate the alarm was that he did not see Mr. Brown, but that he might have been there.  (Carter Depo. 56:20-60:3, Ex. D22).

121.   CS&F mischaracterizes the testimony of Dewayne Brown regarding whether or not the fire department was called.  Mr. Brown testifies that "he" did not report the alarm to the fire department but was "not sure" whether anyone reported the alarm.  Mr. Craig testified that he did not call the fire department, but was not aware regarding anyone else's actions regarding the fire department. CS&F also fails to mention that Mr. Brown testified that it was Tyson's policy, when an alarm

7

sounded, that he should "look until you find what set it off."   (Brown Depo. 99:5-10,100,105, Ex. D19).

122.   This is a mischaracterization of Mr. Carter's testimony.  On the very page proceeding the page of Carter's deposition that CS&F cites to supports its allegation that Carter was not aware of any Tyson policy as to what to do when an alarm sounded, Mike Carter testifies that Tyson gave training regarding how to react to a fire alarm (Carter Depo., 26:1-17, Ex. D22)

123.   CS&F mischaracterizes this alleged fact.  On page 100 of his deposition, Mr. Brown testifies that he was told what to do in case an alarm sounded and a fire could not be found.  Mr. Brown testifies that he was told to "look until you find what set it off."

## B.   <u>Alleged Undisputed Facts Which Require Denial of Summary Judgment</u>

2.   Plaintiffs generally agree with the statement that they have alleged that "one of the contractors started the fire," but would add that the Plaintiffs <u>also</u> allege that the actions and inactions of the Defendants in failing to properly post a fire watch also directly led to the fire, ***regardless*** of the cause.  (Am. Comp., Doc. 15,  ¶¶ 11, 18, 27, 35, 43, 52, 62, 70, 77)

3.   Plaintiffs agree that the fire was started by either a spark from CS&F's

hot work, or the open flame port torch work of Quality.  Plaintiffs also contend that the fire could have been initially ignited by the actions of CS&F starting a smoldering combustion and then the open flame torch being used by Quality later igniting the pyrolysis gasses coming off of the smoldering combustion. (Worsham  Depo. 110: 13-21, Ex. D1)

4.     Plaintiffs agree that the insurers have suffered damages for the monies they paid to Tyson arising from the insurance contracts between Tyson and the subrogated insurer Plaintiffs.

5.     Plaintiffs agree that, due to the nature of the insurance contract, the monies Tyson received from its insurers were insufficient to compensate Tyson for all of its lost profits claims.

6.     Plaintiffs agree that Tyson Foods, Inc., is a Delaware Corporation with its principal place of business in Arkansas, authorized to and conducting business in the State of Alabama.

10.     The Plaintiffs agree that in 2006, Tyson saw the need to make certain roof repairs to the Heflin facility and contracted with the Defendants to make those repairs.

11-15.       The Plaintiffs agree that these are undisputed facts.  Plaintiffs do not agree that these are material facts.

9

16.     The Plaintiffs agree with this statement of fact.  The Plaintiffs would add that CS&F's work at the Southeast corner of the plant where the "Offal/Trailer" area was located was immediately adjacent to the "Pick/Re-hang" area of the plant (also identified as "Area 14" or "Section 14"), and CS&F's work involved hot work on the roof and on top of the wall that separated those areas of the plant.  This is apparent from CS&F's Ex. L, in particular photographs labeled Tyson Int. Disclosure 000854, which show the entire span of the old steel supports being removed by CS&F, including the wall separating the Offal and Pick/Re-hang rooms; and photograph Tyson Int. Disclosure 000860, which is a close-up photograph of the old structural steel members situated on top of the wall separating the two rooms, which CS&F was cutting away.

18.     The Plaintiffs agree with this statement.  For clarity, the Plaintiffs would add that Quality was <u>also</u> tasked with installing a piece of roof membrane (the "temporary patch" or "flap") to protect the top of the brick wall that separated the offal and pick/re-hang areas of the plant, as well as the "crack" or "gap" that existed there.  (Rios Depo. 46:23-47:5, Ex. D10)

19-22.     The Plaintiffs agree with these statements.  Plaintiffs add that, also discussed with the contractors at the meeting, specifically, were hot-work procedures.  (Burdick Depo. 25:10-23, Ex. D8)

23-24.      Plaintiffs agree, generally, with CS&F's statement as to where their employees were generally assigned to work by CS&F.

30-33.      The Plaintiffs agree with these statements.  Plaintiffs do not agree that these are material facts.

34.      Plaintiffs agree CS&F used a welder and grinder.  Plaintiffs do not agree that the use of a grinder (hot work) on the offal area was limited to "the morning." CS&F was conducting hot work until approximately 3:30 pm.  (Rios Depo. 37:12-13; 61:23-18; 68:2-10; Ex. D10).

35.      The Plaintiffs agree that CS&F's work was considered hot work and that they were required to get a hot work permit prior to beginning that work.  Plaintiffs would also add that, in addition to the requirements of NFPA 241 cited by CS&F, that CS&F was required to comply with the provisions of NFPA 51B (Standard for Fire Prevention During Welding, Cutting, and Other Hot Work), Tyson's requirements for contractors, as well as CS&F's own guidelines.  (Contract documents between CS&F and Tyson, Ex. H ¶¶ 2.1.1, 2.1.2, 2.2.2, 2.3.1, 2.3.5, 4.3.1; NFPA 51B, Ex. X).

36-44.      The Plaintiffs agree that hot work permits were required to be issued by Tyson, and it is believed that a Tyson representative did issue a hot work permit to CS&F.  None of the parties, however, have been able to confirm who it was that issued and signed the permit, nor the conditions surrounding the issuance of the

permit.  The Plaintiffs admit that the hot work permit produced by CS&F does not have any indication of the "check list" having been completed by anyone.  CS&F has presented no evidence, however, that a Tyson employee did <u>not</u> go over all of the items on the check-list, so the Plaintiffs dispute that this was not properly done.  The Defendants have not taken the deposition of Tommy Campbell.

45-47.     The Plaintiffs agree that this was the testimony of CS&F employees regarding where they were positioned and that they were indeed conducting fire watch above and inside the offal room.  Plaintiffs do not agree that this is a material fact.

55.     Plaintiffs agree with this statement.  Plaintiffs do not agree that this is a material fact.

62-64.     Plaintiffs agree with these statements.  Plaintiffs do not agree that these are material facts.

65-66.     Plaintiffs generally agree with this accounting of events from the various depositions.  It is uncontroverted that the smoke was seen coming from the areas of the plant where CS&F and Quality employees were working, (Offal and Pick/Re-hang), and that all efforts by CS&F and Quality employees to fight the blaze were concentrated in this area.

67-72.     Plaintiffs agree with this statement.  Plaintiffs do not agree that

12

these are material facts.

78.   Plaintiffs agree that Dan Hopkins testified to the time of the 9-1-1 call, but do not agree the time of the call is a material fact.

79-85.   Plaintiffs generally agree that CS&F has presented in these paragraphs the essential testimony of Mike Bailey, but does not agree that these are material facts.

98-106.   Plaintiffs generally agree with the Defendant CS&F's recitation of the deposition testimony of one of the witnesses, and the Plaintiffs have no direct evidence that would tend to controvert that testimony.  Plaintiffs do not agree that these are material facts.

107-111.   The Plaintiffs generally agree with Defendant CS&F's recitation of the testimony of Mike Carter regarding his initial response to the fire alarm. Plaintiffs do not agree that these are material facts.

112.   The Plaintiffs agree that witness Dewayne Brown also testified that he met Mike Carter and helped investigation the alarm.  The Plaintiffs would not agree to any insinuation that the testimony of Carter or Brown is inconsistent.

114.   Plaintiffs agree that Dewayne Brown made no mention of Brian O'Neil having helped investigate the alarm.  However, neither was he asked.  Plaintiffs do not agree that this is a material fact.

115-118.    Plaintiffs do not dispute these facts.  Plaintiffs do not agree that these are material facts.

119.   Plaintiffs agree with this statement of Mike Carter regarding disabling the smoke detector in the box room.  Plaintiffs do not agree that this is a material fact.

120.   The Plaintiffs agree with CS&F's recitation of Mr. Carter's testimony. There is no record evidence which suggests that the alarm at the Heflin facility was required to "automatically alert the fire department when the alarm sounded."

124.   The Plaintiffs agree with this statement.  Plaintiffs do not agree that this is a material fact.

125-128.    The Plaintiffs generally agree with CS&F's recitation of the testimony of these witnesses.  Plaintiffs do not agree that these are material facts.

129.   Plaintiffs agree that the Heflin facility had no internal fire suppression sprinkler system installed.  The Plaintiffs do not agree that this is a material fact. Plaintiff's expert, John Worsham, has testified that "sprinklers were not required at the time the plant was constructed, and the current codes do not require that a building be upgraded to the current code every time a change in the code is made. Also, the concealed or interstitial space in the pick/re-hang room was not constructed as combustible materials and therefore was not required to have a sprinkler system under the current code."  (Worsham Depo. 124:22-125:7, Ex. D1; Worsham Errata

sheet, Ex. JJ)

130.   Plaintiffs agree with this statement, Plaintiffs do not agree that this is a material fact.

131-133.     Plaintiffs agree with these statements.  Plaintiffs do not agree that these are material facts.  The Plaintiffs' expert has testified that "fire hydrants were located on the road outside the plant and water was available in a pond adjacent to the plant.  In addition, the local fire department was aware that the fire hydrants were not operational, and on site fire fighters reported that they never lacked for water."  The fire chief testified that there was no lack of water at any time during the fire fighting efforts.  (Worsham Depo. 125:8-17, Ex. D1; Hopkins Depo. 27:12, 62:20, Ex. D23).

## III.  LEGAL ANALYSIS

### A.    Summary Judgment Standard

This case is before the court on CS&F's Motion for Summary Judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. When a district court reviews a motion for summary judgment under Rule 56, it must determine two things: (1) whether any genuine issues of material fact exist; and, if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). To succeed, the moving party bears the burden of establishing both prongs of the summary judgment test. The nonmoving party may defeat the motion for summary

judgment by establishing *either* genuine issues of material fact *or* that the movant is not entitled to judgment as a matter of law.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The party seeking summary judgment can meet this burden by offering evidence showing no dispute of material fact or by showing that the nonmoving party's evidence fails to meet some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 323.

When the moving party has met his burden, Rule 56 (e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P 56 (e)). The responding party does not need to present evidence in a form admissible at trial; "however, he may not merely rest on his

16

pleadings." *Celotex,* 477 U.S. at 324. "The plain language of Rule 56 (c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In responding to a properly-supported motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986) (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Substantive law determines which facts are material and which are irrelevant. *Anderson,* 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Issues of fact are "'genuine' only if a reasonable jury considering the evidence presented could find for the nonmoving party." *Anderson,* 477 U.S. at 249. Material facts affect the outcome of the trial under governing law. *Anderson,* 477 U.S. at 248. To determine whether a material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at

17

249; *Patton v. Triad Guar. Ins. Corp.,* 277 F.3d 1294, 1296 (11th Cir. 2002); *Witter v. Delta Airlines, Inc.,* 138 F.3d 1366, 1369 (11th Cir. 1998).

After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving part is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which the jury could reasonably find for the nonmovant. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1998). The court should not weigh the evidence or make determinations as to the credibility of witnesses because these decisions are within the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Thus, "the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." *Graham*, 193 F.3d at 1282 (quoting *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)).

**B.**     **Tyson Has Established Substantial Evidence That CS&F Breached Their Duty of Care**

A determination of the existence of a duty is a question of law for the court. *Berkel and Co. Contractors, Inc. v. Providence Hosp*., 454 So.2d 496 (Ala.1984). This Circuit has long recognized a contractor's to exercise due care in its performance of work.  *Bowyer & Johnson Const. Co. v. White*, 255 F.2d 482 (Ct. App. 5th Cir. 1958).  Moreover, one dealing with dangerous situations must use a degree of care commensurate with the dangers involved.  *Industrial Chem. & Fiberglass Corp. v. Chandler*, 547 So. 2d 812, 831 (Ala. 1988). The Alabama Supreme Court has repeatedly held that "summary judgment is ***rarely appropriate*** in negligence actions, which almost always present factual issues of causation and of the standard of care that should have been exercised."  *McGinnis v. Jim Walter Homes, Inc.*, 800 So. 2d 140, 148-149 (Ala. 2001) (emphasis added).  The Alabama Supreme Court has also held that ". . . negligence does not require direct proof but may be inferred by a jury from the circumstances out of which the injury arose."  *Bell v. Colony Apts. Co.*, 568 So. 2d 805 (Ala. 1990).

In this case, a jury question clearly exists as to whether defendant negligently and wantonly caused the fire.  CS&F undertook the duty to perform hazardous work involving the risk of fire. (LaFavor Depo. 68, Ex. D16; Sutton Depo. 37, Ex. D9;

Christofferson Depo. 53, Ex. D5).  CS&F also undertook the duty to perform a fire

watch of the area in which it was working, yet failed to post a fire watch in the

interstitial space between the drop ceiling and the  roof where the fire originated, and

CS&F failed to keep a fire watch for the adequate period of time.  (Christofferson

Depo. 53:9-19, Ex. D5; Worsham Depo. 57-58, 84-85, Ex. D1).  Irrespective of

whether the jury determines that the fire was caused by a spark from the work of

CS&F, the negligence of Quality, or a combination of both, each had a duty to inspect

and post a fire watch in the interstitial space.  (Worsham Depo. 58, 60, 214, Ex. D1).

The breach of that duty proximately lead to the extensive damage caused by the this

fire.  (J. Worsham Report, p. 14, Ex. C).

Worsham has offered opinions regarding the inactions of the defendants that

led to the spread of the fire beyond a very small one that could have been

extinguished quickly and easily by a properly positioned fire watch, or never started

at all.  A fire watch shall ensure that safe conditions are maintained during hot work

and the fire watch shall be trained to understand the inherent hazards of the work site

and of the hot work being performed. (NFPA 51B §§4.4.1 - 4.4.2, Ex. X).  Because

of CS&F's improper performance of their "hot  work" and/or the requirements upon

them to provide a "fire watch" during their hot work procedures, dangerous

conditions were not identified and the fire was not identified in its incipient stages

and, thus, was able to propagate such that it could not be extinguished before causing major damage.  (J. Worsham Report, pp. 11-14, Ex. C).

> **1.** **CS&F Failed to Perform a Proper Fire Watch Because it Failed To Enter and Inspect the Interstitial Space Between the Roof and Drop-down Ceiling and Failed to Extend Their Fire Watch**

CS&F argues that it did not breach its fire watch duties because it posted a fire watch at both the Offal and Chemical Storage Rooms.  (CS&F's Brief, p. 33). Plaintiffs' position, however, is that the fire watch in the Offal area was negligently performed.  (Worsham Depo. 32-33, 57-58, 84-85, Ex. D1).  The purpose of a fire watch is to ensure that safe conditions are maintained during hot work operations. (NFPA 4.4.2; Worsham Depo. 186, Ex. D1).  CS&F only posted a fire watch on the floor of the Offal Room.  (Worsham Depo. 100, Ex. D1).  CS&F failed to perform a fire watch in the interstitial space between the roof at the temporary patch and the drop down ceiling of the Offal Room.  (Worsham Depo. 57-58, 84-85, Ex. D1).  The fire could have been prevented and/or quickly controlled if CS&F had entered and inspected the interstitial space during its hot work.  (J. Worsham Report, pp. 12-13, Ex. C).

CS&F argues that they did not access the interstitial space to perform a fire watch because it was not accessible.  (Dobbins Depo. 68, Ex. D14).  However, CS&F

has worked with false ceilings like this one in the past and when pressed, a CS&F worker admitted that the space was likely accessible (Dobbins Depo. 70-71, Ex. D14). The fact is CS&F simply failed to even investigate whether the space was accessible, even though hot work was being conducted immediately above the space. Had CS&F merely asked to access the space, Tyson would have assisted CS&F in that endeavor. (Hurst Depo. 74, Ex. D7). Further, whether the space was accessible is immaterial because, if it was not accessible, CS&F should have stopped their hot work. (Worsham Depo. 60-62, 74, Ex. D1). Finally, CS&F has testified it failed to keep the fire watch going for the full time of the hot work. Specifically, Mr. Breeding, CS&F's fire watch in the Offal area, stopped the fire watch earlier in the day before the fire. (Breeding Depo. 85, Ex. D20). This is despite the fact that CS&F was performing hot work in the area immediately before the fire and throwing sparks all over. (Rios Depo. 42, Ex. D10).

### C.   Proximate Causation

#### 1.   Worsham's Testimony

Tyson's expert, John Worsham, has determined that the fire originated along the wall separating the Pick/Re-hang and Offal areas as evidenced by, among other things, several severely heat-disfigured roof supports. (J. Worsham Report, pp. 9, 11, Ex. C). Worsham has also opined that there were three possible direct causes for the

fire: 1) smoldering combustion started by sparks introduced by CS&F into the roofing substrate or into flammable materials introduced into the interstitial space by the contractors; 2) flaming combustion started by Quality's open flame torch, or; 3) a combination smoldering combustion created as described immediately above by CS&F, creating pyrolysis gases that were then ignited by Quality's open flame torch. (J. Worsham Report, pp. 11-13, Ex. C; Worsham Depo. 214, Ex. D1).

While, Mr. Worsham cannot definitively state whether the fire was caused by one or both of the two contractors, he has, eliminated all other competent ignition sources in the area of fire origin, including electrical sources. (Affidavit of J. Worsham, ¶ 6, Ex. II).  He has also opined that the failure of CS&F to post a proper fire watch contributed to the cause of the fire.  (J. Worsham Report, p. 14, Ex. D1; Affidavit of J. Worsham, ¶ 4, Ex. II).  Further, even if CS&F could not access the interstitial space, they should have stopped conducting hot work in the area when they realized they could not access the space. (Worsham Depo. 74, Ex. D1).  Simply, had CS&F had in place a proper fire watch looking into the interstitial space, or stopped working when they determined they could not see the underside of the roof, or the other side of the wall from which they were conducting hot work, the fire would have never occurred or been discovered in its initial stages and extinguished.

### 2.     The Identity and Flammability of the Exposed Materials Which lead to The Fire Is a Question of Fact

CS&F argues that Tyson cannot prove by substantial evidence that CS&F had a duty to protect exposed materials because the identity and flammability of the exposed materials are unknown.   CS&F specifically argues that John Worsham testified that the exposed materials along the wall between the Offal and Pick/Re-hang rooms was a "wooden substrate" that could have been ignited by a spark or torch flame (CS&F's brief, p. 32).   CS&F also cites that Mr. Worsham, though believing the exposed material to be "wooden substrate", does not know the species properties or ignition temperature.  *Id.*  CS&F then goes on to state that Larry Rios emphatically denied that the exposed material was wood and believed it to be fiberglass insulation.   This, is clearly a disputed fact and the jury may draw reasonable inferences from the evidence, as long as there exists a reasonable connection between the fact proved and the ultimate fact inferred. *Osborn v. Brown*, 361 So. 2d. 82, 87 (Ala. 1978).   The jury may decide to trust Worsham's opinion of what the exposed material appeared to be, or they may trust Larry Rios' description. Irrespective, this is clearly no basis for summary judgment on the issue of proximate caused based purely on this issue.

### 3.   The Evidence Points to One Theory of Causation, Thus Worsham's Testimony Is Not Speculation Nor Conjecture

Defendants argue that unless Worsham cannot point to one party as the "more likely" party to have initiated the fire, then no recovery can be had.  This argument is without merit.  Worsham has given a well-reasoned account of the origination of the fire and breaches of duty by CS&F which caused the resulting damages.  The question of proximate causation is ordinarily one for the jury, if reasonable inferences from the evidence support the plaintiff's theory. *Marshall County v. Uptain,* 409 So.2d 423 (Ala. 1981 ); *Garner v. Covington County,* 624 So.2d 1346, 1349 (Ala.1993). See also *Green v. Alabama Power Co.,* 597 So.2d 1325 (Ala.1992); and *Cain v. Sheraton Perimeter Park South Hotel,* 592 So.2d 218 (Ala.1991).  Further, the Alabama Supreme Court has described a "conjecture" as an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference.  *Southern Ry. Co. v. Dickson*, 211 Ala. 481, 100 So. 665 (Ala. 1924).

The most distinct difference in the cases cited by CS&F and the case before the Court is that, in all those cases, there were numerous other "possible" causes of the injury, most of which did not point to the conduct of the named defendants; all explanations for cause were "possibilities" that could explain the end result; and none more likely than the other. For example, in *Ex Parte Mobile Power & Light*, the

25

electrical contractor blamed for a fire serviced the home 2 years prior to the fire, and the Plaintiff's expert opined that, while the initial electrical work *could have* caused the fire, other intervening electrical work over those two years also could have caused the fire. *Ex parte Mobile Power and Light, Co., Inc.*, 810 So.2d 756 (Ala. 2001). Understandably, the court held that, where there was no evidence that any one theory was more likely than the one alleged against the tortfeasor, summary judgment was proper.

However, in this case, unlike the cases cited by Defendant, there is clear testimony regarding how this fire was caused:  a spark entered the combustible roofing materials or the interstitial space through an open and cut section of roof. The cut exposed a combustible wood fiber substrate which was then ignited. (J. Worsham Report, p. 12, Ex. C; Affidavit of J. Worsham, ¶ 4, Ex. II).  There are no "alternative" or other "possible" causes of the fire offered by the Plaintiff.  There are only questions of fact for the factfinder of which defendant (or whether perhaps both) breached their duty of care by setting the fire in motion.  There is testimony that CS&F was performing hot work approximately one hour before the fire.  (Rios Depo. 42, Ex. D10) There is testimony directly from CS&F that their saw was throwing sparks directly down into the Offal area.  (Breeding Depo. 46, Ex. D20).  The jury is certainly permitted to determine proximate cause through the factual determination

that combined or concurrent activity of either CS&F and/or Quality created the fire. (*See Jones v. General Motors Corp*, 557 So. 2d 1259, 1263 (Ala. 1990), holding that where the negligence of one defendant combines with the negligence of another, each negligent person is liable for the resulting damage and the negligence of each is the proximate cause of the injury).

Even after the determination is made by the factfinder of whether Quality, CS&F or a combination of the actions of both caused the initial fire, the issue becomes whether CS&F breached a duty of care by failing to stop the spread of the fire by its improper and ineffective fire watch. Not only did CS&F owe a duty to prevent the fire, they also owed a duty to prevent the fire's spread. Yet CS&F failed to post a fire watch inside the plant (the interstitial space) to watch the underside of the roof during and after the "hot work". (J. Worsham Report, pp. 12-13, Ex. C). Violation of a duty by the failure to prevent the fire's spread is ***a question of fact for the jury***. *Central of Ga. Ry. Co. v. Griffin*, 36 Ala.App. 292, 55 So.2d 218 (Ala. App. 1951) (other citations omitted); *See also Indamer Corp. v. Crandon*, 196 F.2d 5 (Ct. App. 5th Cir. 1952) wherein the Court chastised Plaintiffs for assuming that only causing the original fire was actionable, where it was clear that the significant breach of duty was not in the origin of the fire, but in the failure of defendant to prevent the spread.

The facts before the court in this case are similar to the facts before the court in *Vesta Fire Ins. Corp. v. Milam & Co. Const., Inc.*, 901 So.2d 84 (Ala. 2004) where the court refused to apply the selective application doctrine.  In *Vesta*, while the expert testimony did not necessarily point to work performed by the defendant electrical contractor as a cause of the fire, the evidence clearly pointed to a duty incumbent on the contractor to notify of problems in the system which ultimately caused the subsequent fire.  *Vesta*, 901 So. 2d 84, 99-101.  Like in *Vesta*, the breach here is *not only* the breach of the duty of the defendant to conduct its "hot work" in a reasonable and safe manner, but also the duty to post a fire watch in the area of the interstitial space.

### 4.     The Evidence Does not Require the Jury to Speculate on the Origin of the Fire

Defendant argues that Plaintiffs have no "direct evidence" of the origin of the fire.  While Defendant's expert has not formed any opinions regarding the fire's origin, Worsham certainly has.  A jury is permitted to draw reasonable inferences from the evidence, as long as there exists a reasonable connection between the fact proved and the ultimate fact inferred. *Osborn v. Brown*, 361 So. 2d. 82, 87 (Ala. 1978).

Worsham's theory that origin of the fire was at the space between the Pick/Re-

28

hang and Offal rooms is supported by the evidence.  Immediately before the fire, both CS&F and Quality were performing hot work at the Southeast end of the plant near the temporary flap between the Offal and Pick/Re-hang rooms this area.  (J. Worsham Report, p. 5, Ex. C; Worsham Depo. 36, Ex. D1).  Many witnesses have testified that, after the smoke was discovered, the temporary flap between the Offal and Pick/Re-hang area was pulled back and fire was discovered in that area and between the interstitial space between of the roof and drop down ceiling of the Offal room. (Barger Depo. 89, Ex. D11; Hager Depo. 69, Ex. D21).  Worsham points to this area based on the interviews of fact witnesses who observed fire on the bottom side of the roof and smoke coming out of the exhaust fans in this area of the plant.  (J. Worsham Report, p. 5, Ex. C).  Quality's employees also testified that CS&F was throwing sparks all over this area during their hot work. (Rios Depo. 41:16-42:15, 47; 6-19, Ex. D10; Anderson Depo. 33:5-24, 34:15-17, 71:10-72:20, Ex. D12; Barger Depo. 65:18-66:14, Ex. D11).  While the most extensive damage to the plant was near the North end of the plant (away from where the fire originated), Worsham has explained that this is because this area of the plant contained the largest amount of combustible materials.  (Worsham Depo. 128, Ex. D1). Here, it is a logical inference that the fire originated in the location suggested by Worsham.

Based on the foregoing, Defendant's argument that there is no substantial

evidence of the origin of the fire is unsupported and summary judgment on this issue should be denied.

### D. <u>Contributory Negligence and Last Clear Chance</u>

#### 1. Any Alleged Contributory Negligence of Tyson Is a Question of Fact

Defendant alleges that Tyson was contributorily negligent because it disabled a "fire alarm" in another area of the building; Tyson did not have a proper fire suppression system in place; and issued hot work permits in violation of the NFPA. Generally, contributory negligence is a question of fact for the jury. "Where from the facts shown by the evidence, although undisputed, reasonable men ***might draw different conclusions*** as to negligence or contributory negligence, such questions are for the jury, and it is only when the facts are such that all reasonable men must draw the same conclusion that negligence or contributory negligence is ever a question of law for the Court." *Lowe's Home Centers, Inc. v. Laxson*, 655 So.2d 943, 945 (Ala. 1994), citing *Quillen v. Quillen,* 388 So.2d 985, 987-88 (Ala.1980). "As with negligence generally, . . . a finding of contributory negligence turns on the facts and circumstances unique to each case. . . ." *Lowe's Home Centers*, 655 So.2d 943, citing *Central Alabama Electric Co-op. v. Tapley,* 546 So.2d 371, 381 (Ala.1989). Further, to act as a bar to recovery, the contributory negligence ***must be*** a concurring

proximate cause of the injury.  *Crocker v. Lee*, 261 Ala. 439, 74 So.2d 429 (Ala. 1954) (emphasis added).

### (a)   Disengaged Smoke Detector

Defendants have failed to put forth any testimony tending to show that had this smoke detector not been disabled, the fire would have been detected or prevented.

The smoke alarm that disengaged occurred approximately 1 hour prior to the fire in another part of the plant, away from where Worhsam opines that the fire originated. (Worsham Depo. 128, Ex. D1).  While the detector went off in the box room (the area where the most fire damage occurred) this is because this was the area of the plant that housed the most combustible materials.  (Worsham Depo. 128, Ex. D1).  The smoke detector was unrelated to the fire in question, and it was simply a coincidence that the smoke detector that was disabled caused an alarm in the facility in such close proximity to the actual fire.  ***Several*** Tyson employees who investigated the cause of the fire alarm by, per proper protocol, going to the fire alarm panel located within the building, and investigating the cause of the alarm.  (Craig Depo. 101, Ex. D4; Brown Depo. 90, Ex. D19; Carter Depo. 30, Ex. D22).   It was discovered that a smoke detector in the box storage area of the plant had detected smoke.  (Brown Depo. 90-91, Ex. D19).    The Tyson employees visited the box storage room, investigated the cause of the alarm and determined that the smoke

31

alarm detected either smoke or dust from the work being done at the chemical room by one of the defendants.  (Craig Depo. 101, Ex. D4; Brown Depo. 90-93, Ex. D19). In fact, CS&F employees have testified that they were welding or conducting masonry work during the approximate time of that alarm.  Tyson employees have further testified that they returned to the alarm panel and bypassed the smoke detector in the box room in order to avoid any future "false alarms."  (Carter Depo. 30-31, Ex. D22).  Worsham opined that in circumstances like those here, it is reasonable to disable a smoke detector in order to avoid what are termed either "nuisance alarms" or, simply, false alarms.  (Worsham Depo. 177, Ex. D1).

Thus, there is no evidence that Tyson's disengagement of the smoke detector was negligent nor that it caused or contributed to the cause of the fire.  At the very least, whether Tyson was negligent in this regard is a question of material fact for the jury.

### (b)    Fire Suppression System

Defendant alleges Tyson should have had fire sprinklers installed in the building, and operable fire hydrants, and the failure to have both was negligence on the part of Tyson.  However, Defendant has given no supporting testimony that the sprinkler system ***should have*** been in place and was required under the building codes applicable at the time the facility was constructed.  There is no testimony nor

authority cited by Defendant showing that Tyson is under a duty to conform the plant to the updated codes cited by the Defendant.  Worsham has stated he has no criticisms of Tyson's failure to have a sprinkler system.  (Worsham Depo. 137, Ex. D1). Further, the testimony is clear that the fact that there were no hydrants on the Tyson property did not prevent or delay the fire departments' efforts to suppress the fire. (Hopkins Depo. 27, Ex. D23). At the very least, whether or not these actions by Tyson were negligent is a question of material fact.

### (c)     Hot Work Permits

Plaintiffs agree that NFPA 51b § 4.1 places certain responsibilities on Tyson and their Permit Authorizing Individual ("PAI") for the *issuance* of hot work permits. However, it is very important to recognize that the dangerous condition here (*i.e.* exposure of the flammable "edge" of the roof and the "gap" at the area of the temporary flap) which ultimately lead to the fire was created long after the PAI had signed off on the hot work permits.  Specifically, the permits were issued *in the morning* to CS&F and CS&F's fire watch person simply assumed it was "good" for the entire day.  (Breeding Depo. 85, Ex. D20).   Later, the flammable materials and the "gap" were exposed and the temporary patch was applied after 12pm on the day of the fire.  CS&F offers no testimony that the PAI is responsible for a condition which did not exist at the time the hot work permits were issued.

CS&F places blame on Tyson project manager, Rick Craig, stating that because he was on-site that day and taking photographs, that he should have noticed the improper hot work, recognized the danger, and stopped the work if conditions were unsafe.  (CS&F's brief, p. 51) CS&F's cherry picked segments of Mr. Craig's testimony does not give the full picture.  Mr. Craig testified that he *did not witness the application of the roofing membrane* tie-in that occurred on the edge of the roof just prior to the discovery of the fire.  (Craig Depo. 91, Ex. D4).  Mr. Craig did not observe, nor was he required to observe, all the work on the roof. (Craig Depo., 89, Ex. D4).  Mr. Craig was based out of Tyson's corporate offices in Fayetteville, Arkansas, and was only temporarily at the Tyson facility to oversee the technical portions of the roofing project.  (Craig Depo., 11:11-12, Ex. D4).  Mr. Craig was not the PAI and testified that it was the contractors who were responsible for the "means and methods of the contractors work." (Craig Depo., 43:9-16, Ex. D4).

## 2.    Last Clear Chance Doctrine/Subsequent Negligence Prevents Application of the Contributory Negligence Bar

Even had Tyson been negligent for the reasons cited by Defendant, it was defendant who had the last clear chance to avoid the fire by virtue of having the fire watches in place at the time the hot work was ongoing.

The doctrine of last clear chance or subsequent negligence developed as a modification to the harsh rule of contributory negligence.  *See National R.R.*

34

*Passenger Corp v. H&P, Inc.*, 949 F. Supp. 1556 (M.D. Ala. 1996).  This doctrine

applies to permit recovery under certain circumstances even where a plaintiff's

negligent act has placed him into a position of danger.  *Baker v. Helms*, 527 So. 2d

1241 (Ala. 1998).  The elements of subsequent negligence are:

> (1)   The plaintiff was in a perilous position;
>
> (2)   of which the defendant had actual knowledge;
>
> (3)   armed with such knowledge the defendant failed to use    reasonable and ordinary care in avoiding the accident;
>
> (4)   the use of reasonable and ordinary care would have avoided the accident;
>
> (5)   the plaintiff was injured as a result.

*Baker*, 527 So. 2d 1241.

In this case, had  "hot work" and required fire watches  been performed

properly by the Defendant, the gap would have been covered to prevent sparks and

fire.  Additionally, Defendant failed to have a fire watch monitoring the void space

during the "hot work" watching for dangerous conditions. (J. Worsham Report, p. 14,

Ex. C). Even under the argument that the PAI had a duty to <u>initially</u> confirm

"mutually" <u>with</u> Defendant CS&F that dangers had been safeguarded against,  the

defendant's fire watch still was required to  physically monitor the void space during

the hot work. (J. Worsham Report, p. 14, Ex. C; NFPA 51b, Ex. X).  Simply, while the PAI had the opportunity to look at the jobsite and determine whether conditions were safe <u>initially</u>, he left the job long before the fire began and before the gap which allowed sparks, flame, or flammable materials to enter into the interstitial space was created.  After that "gap" was made and it was determined that the interstitial space was inaccessible, it became incumbent upon the Defendant to cease hot work operations and protect the opening, or contact Tyson for further instructions.

Because defendants had the last clear chance to avoid the fire and it was their subsequent negligence that resulted in the fire not being detected, any contributory negligence of the plaintiff does not bar recovery.

### E.    Whether CS&F Acted Wantonly Is an Issue of Fact for the Jury Because Plaintiffs' Have Presented Sufficient Evidence to Infer Wanton Conduct on the Part of CS&F

Defendant argues that it did not knowingly or consciously disregard a known risk of fire.  Nothing could be further from the truth when taking the established facts into account.

Alabama wantonness claim does not require proof that a defendant harbored a specific design or intent to cause harm. *Kerns v.* Sealy, 496 F.Supp. 2d 1306, 1318, citing *Clark v. Kindley,* --- So.2d ----, ----, 2007 WL 431018, *3 (Ala.Civ.App.2007. Under Alabama law, "[w]antonness is a question of fact for a jury, unless there is a

total lack of evidence from which the jury could reasonably infer wantonness." *Id.* at 1319, citing *Clark,* --- So.2d at ----, 2007 WL 431018, at *3 (citation omitted); *see also McDougle v. Shaddrix,* 534 So.2d 228, 231 (Ala.1988).

In this case, it is reported that, while performing its hot work on the day of the fire, CS&F was using a grinder to cut steel on a section of the roof immediately above the area where the fire originated and throwing sparks all over the area.  (Rios Depo. 42, Ex. D10).  Despite the fact that CS&F *knew* that there was an exposed gap along the area they we were working, *knew* the danger associated with "hot work," and *knew* of the duty to perform a fire watch, they still performed their work by throwing sparks all over the area, failed to post a fire watch in the area beneath the interstitial space and failed to continue their fire watch for the appropriate amount of time.  (Rios Depo. 42, Ex. D10; J. Worsham Report, p. 14, Ex. C).  Further, CS&F's employee admits he knew about the gap, he has seen roofs like these in the past and, admits that the interstitial space most likely ***was*** accessible.  (Dobbins Depo. 68-71, Ex. D14).

The facts before the court here are similar to those in *Kerns v. Sealy*, 496 F.Supp. 2d 1306.  In *Kerns*, the plaintiff's home burned after being sprayed with spray-on foam.  The court held that while record contained no evidence that defendants intentionally set fire the Plaintiff's home, summary judgment on the issue of watonness was proper because the record ***did contain*** evidence that the defendants

37

had actual knowledge of the risk of fire attendant to spraying polyurethane foam insulation in the Kernses' attic, yet consciously failed to take reasonable precautions to mitigate that risk (such as using lights and fans, stopping application whenever the second team member was offsite, not spraying foam insulation in and around an eave into which they could not see, etc.).  The court held that these facts gave rise to an inference that defendants recklessly disregarded the risk, despite being conscious of it.  *Id.*

Just as in *Kerns*, the evidence before the court clearly gives rise to an inference of wantonness, and thus, summary judgment on this issue should be denied.

**F.    Plaintiffs Have Established Sufficient Evidence that CS&F Breached Specific Terms of its Contract With Tyson**

A lawful and binding contract under Alabama law requires offer, acceptance, consideration and mutual assent to the essential terms of the contract.  *Ex parte Steadman*, 812 So. 2d 290, 293 (Ala. 2001).  The Alabama Supreme Court has recognized that claims for tortious conduct and for breach of contract may certainly be maintained in a single suit, but that Plaintiff must be able to show that a promise was breached.  *Eidson v. Johns-Ridout's Chapels, Inc.*, 508 So.2d 697 (Ala. 1987). While the terms of the contract do not specifically use the words "reasonable care," it is undisputed that Defendant agreed to perform the work and agreed to perform a

fire watch.  (Contract, Safety Policy, § 2.3 Ex. I).   The contract also provides the specific duties of the fire watch including, "prevent ignition of flammable materials" and "stop the job if unsafe/hazardous conditions are observed" and finally, "maintain his/her position for 30-60 minutes after completion of welding or cutting to extinguish possible smoldering fires." *Id.*  Finally, the contract provides that CS&F warrants that all goods and services will conform with appropriate standards and will be free from defects.  (Contract, General Requirements, §1.14, Ex. I).

Plaintiff alleges that Defendant breached its contract when it failed to follow appropriate standards by failing to post a proper fire watch in the proper area and for the required length of time.  For these reasons, Defendant breached the contract and Plaintiffs are entitled to be reimbursed for the full amount of the contract.  Summary judgment on this issue is improper.

### G.   Plaintiffs Have Established Sufficient Evidence That CS&F Knew Or Should Have Known That Its Employees Were Not Properly Trained And/or Supervised

Under Alabama law, the liability of an employer for negligent supervision or training requires, among other elements, proof of the employer's actual or constructive awareness of the employee's incompetency. *Ott v. City of Mobile*, 169 F.Supp.2d 1301 (S. D. Ala. 2001).  The elements of negligent supervision were addressed in *Lane v. Central Bank of Alabama, N.A.,* 425 So.2d 1098 (Ala. 1983), as

follows:

> In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, **had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge.**

425 So.2d at 1100 (emphasis added); see also *Sanders v. Shoe Show, Inc.,* 778 So.2d 820, 824 (Ala.Civ.App.2000). A party alleging negligent or wanton supervision and hiring must also prove the underlying wrongful conduct of employees. *Voyager Ins. Companies v. Whitson,* 867 So.2d 1065, 1073 (Ala. 2003) citing *Stevenson v. Precision Standard, Inc.,* 762 So.2d 820 (Ala. 1999). See also *University Federal Credit Union v. Grayson,* 878 So.2d 280, 291 (Ala. 2003).

There is simply no dispute that the type of work in which Defendant undertook to perform was dangerous: it involved open flames and potential for fire.  The facts of this case speak for themselves: had Defendant exercised due care in training his/her employees those employees would have known how to conduct a proper fire watch.  Failure to do so is clear evidence of negligent training and supervision. Thus, Plaintiffs have established substantial evidence of a failure of CS&F to properly hire and train those employees conducting a fire watch.

40

## IV.  <u>CONCLUSION</u>

Plaintiffs have established substantial evidence of the course of discovery in this matter of the cause and origin of the fire.  Moreover, Plaintiffs have established evidence tending to show that the fire was caused by breaches of CS&F both in its performance of "hot work" and its failure to properly post a fire watch, both of which led to the fire.  While Plaintiff does not believe it was contributorily negligent, even if it was, any negligence is a question of fact for the jury.  And further, any negligence of Plaintiffs is immaterial because of the subsequent negligence by CS&F.  Further, Plaintiffs have clearly shown an inference of wantonness by CS&F, that the contract between CS&F and Tyson was breached by CS&F and that CS&F negligently trained and supervised its employees on the job.  For these reasons, CS&F's Motion for Summary Judgment is due to be denied.

Respectfully submitted,

BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP


/s/ Sean P. Ravenel
JOHN C. S. PIERCE
Alabama Bar No.: PIERJ0347
SEAN P. RAVENEL
Florida Bar No.:  0581364
SCOTT S. KATZ
Florida Bar No.: 0709476

Attorneys for Plaintiffs
BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP
One Harbour Place, Suite 500
777 S. Harbour Island Boulevard
Tampa, Florida  33602
Telephone:  (813) 281-1900
Facsimile:   (813) 281-0900
E-Mail: sravenel@butlerpappas.com
       skatz@butlerpappas.com

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on January 8, 2010, Plaintiffs' Opposition to Defendant Quality Roofing's Motion for Summary Judgment were provided via electronic mail to the following counsel of record: Thomas T. Gallion, III, Constance Walker, Michael Kelly, Rebecca A. Beers, James Campbell,  Ripon Britton, Jr., Benjamin Goldman, and Adrian D. Johnson.

           /s/ Sean P. Ravenel_____
           Sean P. Ravenel
           Florida Bar No.: 0581364
           Scott S. Katz
           Florida Bar No.: 0709476
           Attorneys for Plaintiffs
           Butler Pappas Weihmuller Katz Craig LLP
           One Harbour Place, Suite 500
           777 S. Harbour Island Boulevard
           Tampa, Florida 33602
           Telephone: (813) 281-1900
           Fax: (813) 281-0900
           E-Mail: sravenel@butlerpappas.com
               skatz@butlerpappas.com